PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
JEVECHIUS D. BERNARDONI (CABN 281892)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7224
    Facsimile: (415) 436-6748
    jevechius.bernardoni@usdoj.gov

Attorneys for Federal Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| US RIGHT TO KNOW, a California Non-Profit Corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>NATIONAL INSTITUTES OF HEALTH,<br><br>    Defendant. | Case No. 4:23-cv-2954-KAW<br><br>**JOINT STATUS REPORT** |

      Defendant National Institutes of Health (the "Agency") and plaintiff US Right to Know ("Plaintiff") file this joint status report pursuant to the Court's April 24, 2025 order (ECF No. 38).

**Joint Factual Update**

      In an effort to narrow the scope of potentially responsive records, the Agency provided Plaintiff with hit count information for the search terms proposed by the Agency on March 24, 2025. On March 25, 2025, Plaintiff asked for hit counts on an additional 21 search strings. The Agency provided the hit count information for Plaintiff's proposed search terms on April 25, 2025. After reviewing the hit count information provided by the Agency, Plaintiff indicated that it is not willing to narrow FOIA Request Two further and thus insists that the Agency process the approximately 43,000 pages of potentially responsive records received from Dr. Morens' personal attorney in their entirety.

There are two issues currently before the Court: (1) the processing rate that should be applied to the 43,000 pages of potentially responsive records the Agency received from Dr. Morens' personal attorney and (2) the Agency's obligations—if any—under the FOIA to seek to recover native versions of the emails from Dr. Morens.

### Plaintiff's Position

Processing Rate: In an effort to narrow the universe of potentially responsive records, on March 25, 2025 Plaintiff USRTK provided Defendant NIH with a number of search terms that are highly specific to USRTK's work and research on the origins of COVID-19. It took NIH a month to run those search terms against the 43,000 pages – a practice of delay that is becoming a hallmark of this case – and the results of the search were as follows:

DEFUSE: 117 items, 2990 pages

DARPA: 206 items, 4,339 pages

Private funding: 34 items, 1203 pages

Furin: 349 items, 15,312 pages

ACE2: 291 items, 23,022 pages

Progenitor: 156 items, 7,202 pages

Union of Concerned Scientists: 108 items, 2,832 pages

Wuhan Institute of Virology: 1,131 items, 15,602 pages

WIV (all caps): 848 items, 12, 253 pages

Restriction: 131 items, 19,661 pages

Bsal: 0 items

BsmBI: 9 items, 245 pages

Database: 489 items, 27,047 pages

Yunnan: 263 items, 7148 pages

Mojiang: 49 items, 844 pages

Baric: 437 items, 12,399 pages

biosafety: 716 items, 20,956 pages

BSL: 348 items, 10,728 pages

       Ben Hu: 14 items, 951 pages

        gain of function: 944 items, 14,151 pages

        gain-of-function: 944 items, 14,151 pages

  Based on the number of responsive "hits" that these COVID-specific search terms revealed, USRTK understandably requests that NIH process FOIA Request Two as originally written, as there is clearly highly relevant information contained within the Dr. Morens' file volume. That Request sought "all email correspondence from or to Dr. Morens (including CC, BCC, and attachments) with the following email domains and organizations: @ecohealthalliance.org [and] 'EcoHealth Alliance[.]'" ECF No. 1-3. While NIH has repeatedly characterized this is as a "broad" request, at the end of the day it simply seeks emails from one agency employee to one email domain. Had Dr. Morens complied with the law and not used his personal email account to conduct government business, NIH would not be in the present situation. That Dr. Morens intentionally and unlawfully hid these emails from public scrutiny only heightens USRTK's desire to obtain them, and a FOIA requester need not further winnow down an already narrow and specific request merely because the number of potentially responsive pages is high.

  NIH's position on processing remains the same as it did when the Parties last appeared before the Court: 300 pages/month. Consequently, much of what follows is identical to USRTK's position in the Parties' March 13, 2025 Case Management Statement. At bottom, adopting Defendant's schedule would have the production phase of this case last another 143 months, or just under twelve years. Such a proposal is flagrantly unlawful, because the FOIA says production of responsive records must occur "promptly." 5 U.S.C. § 552(a)(3)(A). Courts in this District interpret "promptly" to mean "within days or a few weeks of a determination, not months or years." *Sierra Club v. United States Env't Prot. Agency*, No. 18-CV-03472-EDL, 2018 WL 10419238, at *5 (N.D. Cal. Dec. 26, 2018) (citing *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 711 F.3d 180, 188 (D.C. Cir. 2013). The FOIA requires records to be produced "promptly" because the "value of information is partly a function of time." *Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1041 (9th Cir. 1999).

  Defendant tenders a declaration with this joint status report. USRTK does not believe a joint status report or case management statement is the proper vehicle for filing declarations. For the sake of moving this case forward and conserving judicial resources, USRTK will not move to strike the

declaration or insist on a formal briefing schedule on this issue. In that declaration, NIH asserts it lacks the resources to comply with the law because of the Executive's decision to unilaterally terminate staff and slash the agency's budget. This argument is meritless, because courts have repeatedly held that an agency's "limited resources do not relieve it of its statutory obligation to promptly provide requested documents." *Sierra Club*, 2018 WL 10419238, at *6 (citing *Fiduccia*, 185 F.3d at 1041). As the Ninth Circuit recognizes, compliance with the FOIA may require agencies to "divert staff from programs they think more valuable to Freedom of Information Act compliance" and raise other political and practical concerns, but federal agencies should address those concerns to Congress, rather than the courts. *Fiduccia*, 185 F.3d at 1041; *see also Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.,* 85 F. Supp. 3d 1074, 1090 (N.D. Cal. 2015) ("Although the Court and many others have recognized that agencies' resources are heavily taxed by the quantity and depth of FOIA requests, that does not grant the agency carte blanche to repeatedly violate congressionally mandated deadlines."). At bottom, it is incumbent upon NIH to request from Congress the resources it needs to comply with the requirements of the FOIA, not stand behind a lack of resources as a shield.

      Notably, Defendant is not asking for an *Open America* stay, nor could it, given that at no point in time has the agency raised exceptional circumstances under 5 U.S.C. § 552(a)(6)(C)(i), either in the FOIA administrative stages or in this litigation. Indeed, Defendant's declaration does not describe any "exceptional circumstances" that apply to this case. The Declaration represents the agency has 880 backlogged FOIA Requests, Garcia-Malene Decl. Para. 33, but makes no statements about whether NIH has demonstrated "reasonable progress" in addressing that backlog. *Id*. § 552(a)(6)(C)(ii). This is unsurprising, as the numbers show the Defendant has made <u>zero progress</u> addressing its backlog: in HHS' prior Fiscal Year 2024 FOIA Annual Report, NIH reported a backlog of 838 FOIA requests, less than it does today. *See* https://www.hhs.gov/foia/reports/annual-reports/2024/index.html (search for "backlog"). This shows a trend in the wrong direction—increasing agency backlogs—and plainly does not qualify as "exceptional circumstances" or as a justifiable excuse to give Defendant over a decade to produce responsive records.

      Defendant seems to believe that the FOIA's "prompt" production requirement does not apply to it simply because the Executive has unilaterally terminated agency staff and cut agency funding that was

already allocated by Congress in prior funding bills. The FOIA contains no such exemption, and the Court should require NIH to comply with the FOIA's unambiguous production requirements. Accordingly, USRTK again requests the Court order NIH to make rolling monthly productions and complete processing of the remaining Dr. Morens' file <u>within one year</u> of the upcoming CMC. This is an already enlarged timeline than what is contemplated under the FOIA, especially for a case that has been on the Court's docket since August, 2023.

<u>Metadata</u>: USRTK finally learned of the "steps" NIH took regarding the Morens' production file and its native metadata when it was provided with an executed copy of the Garcia-Malene Decl., received today, May 13, at roughly 1 PM PT. The information contained within the Declaration and provided herein in Defendant's position statement about how and whether NIH could obtain any further information is <u>exactly</u> what USRTK requested previously and during the last Case Management Conference, and it is disappointing that it took Defendant so long to provide this basic information. At this juncture, the Court should order NIH to process the PDFs in accordance with the deadline proposed above.

USRTK must address two points raised by NIH to protect and clarify the record. First, metadata is useful beyond a tool for "narrowing," as Defendant contends. Metadata can provide information about specific email addresses that sent or received information, the recipients on "BCC" lines, and information about attachments that may be part of the email exchange. Furthermore, PDF documents do contain metadata, especially when converting Gmail or other emails to PDF format. It is standard discovery practice that converting native files to PDF documents will retain native metadata. Second, NIH asserts that USRTK requested responsive records to be produced as PDFs, but ignores that USRTK FOIA Request asks for "email correspondence…(including CC, BCC and attachments)" related to Dr. Morens' email exchanges with the "@ecohealthalliance.org" domain name. NIH seemingly suggests that FOIA requesters must also specifically ask for "metadata" associated with those records, but metadata by its very nature is an integrated part of an electronic file, not a separate "agency record" that must be specified by a FOIA requester.

## The Agency's Position

Processing Rate:  In a good faith effort to narrow the universe of potentially responsive records (and expedite processing of the specific material that Plaintiff seeks in this FOIA dispute), the Agency provided Plaintiff with hit count information for (1) search terms proposed by the Agency and (2) search terms proposed by Plaintiff.  Such a narrowing would have reduced the processing timeframe required in this case, but Plaintiff declined to narrow its FOIA request after reviewing the hit count information.  To be clear, the Agency does not ask the Court to impose search term limitations on Plaintiff's FOIA request and the Agency is willing to process the approximately 43,000 pages of potentially responsive records.  But any processing of the voluminous material at issue here must take into account the Agency's other FOIA obligations and staffing shortages.  The Agency's FOIA processing capacity is described in more depth in the attached Declaration of Gorka Garcia-Malene ("Garcia-Malene Decl."), parts of which are excerpted below for the Court's convenience.

NIH-FOIA's processing rate of 300 pages per month capitalizes on its workflow and ensures that more pages for more requestors are processed each month.  This allows for fair and equitable processing of all NIH FOIA requests.  This is particularly true in light of the demands posed by the growing number, size, and complexity of FOIA requests received by NIH, and the constraints of reduced staffing. Implementing an extreme page review requirement, as requested by Plaintiff in this litigation, would result in a diverting of a disproportionate share of agency resources from responding to a myriad other FOIA requests, to a single FOIA requester.

During Fiscal Year (FY) 2024 alone, NIH received 1,758 new FOIA requests.[1]  While gains in efficiencies allowed NIH-FOIA to process 1,688 requests, 1,007 remained pending at the end of the fiscal year. NIH currently has 1,313 pending FOIA requests in queue, 880 of which are backlogged requests from prior years.

In addition to the demands of processing new and backlogged FOIA requests, NIH has experienced a steady increase in litigations. Presently, NIH has 62 active litigations.  Plaintiff alone has four active

---

[1] *See* HHS Fiscal Year 2024 Freedom of Information Annual Report, *available at* https://www.hhs.gov/foia/reports/annual-reports/2024/index.html.

litigations with NIH, requiring NIH-FOIA to process 1,000 pages each month solely for Plaintiff's FOIA requests in active litigation.

NIH-FOIA must also balance the demands of increased FOIA requests and litigations with the limitations of reduced staffing. Pursuant to ongoing initiatives to reduce staffing across the federal government, NIH is projected to cut total FOIA staffing by more than 40 percent within the next month.

As of June 2, 2025, NIH FOIA personnel at the Office of the Director – where FOIA litigation is processed, is anticipated to retain eight personnel. Of the remaining eight personnel, one staff member is responsible for administrative tasks and three staff members are assigned to process new FOIA requests, backlogged FOIA requests, and appeals. The litigation team is projected to be cut in half, with four staff remaining, one team lead managing FOIA litigations full time and three staff members balancing a workload of FOIA litigations, appeals, and non-litigation requests.

As described in the Garcia-Malene Declaration, NIH is simply unable to process potentially responsive records at a rate greater than 300 pages per month. Any large page review requirement, even one not as large as that requested by Plaintiff, would stress NIH-FOIA operations, interfere with NIH's ability to meet agreed-upon and court-imposed deadlines in other FOIA litigations, create serious consequences for other requesters, and lead to further delays in processing requests, and other complications.

<u>Native Versions of Dr. Morens' Emails</u>:  It is the Agency's position that the issue of whether the Agency can be forced to seek native versions the emails in Dr. Morens' personal email account is outside of the scope of relief that Plaintiff can obtain in this FOIA lawsuit for four independent reasons.

First, the issue of whether the Agency should (or even could) be ordered to attempt to obtain native versions Dr. Morens' personal emails is outside the scope of the FOIA request at issue in this lawsuit. The FOIA provides that "an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format."  5 U.S.C. § 552(a)(3)(B). Plaintiff's FOIA request expressly indicates that it seeks responsive records "in PDF format"; the FOIA request does not seek native version of these documents, and it does not even mention metadata.  *See* ECF No. 1-3 at 7.  The Agency has in its possession PDF versions of emails received from Dr. Morens' personal attorney, and that is precisely the format requested by Plaintiff.  As such, the Agency's intention to release

these records "in PDF format" is in full compliance with Plaintiff's FOIA request. Section 552(a)(3)(B) of the FOIA requires nothing more of the Agency. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Educ.*, 905 F. Supp. 2d 161, 172 (D.D.C. 2012) (rejecting the argument that a government agency must produce metadata where the FOIA request did not seek metadata).

Second, to the extent Plaintiff's FOIA request could be interpreted to include metadata (notwithstanding the absence of any such language on the face of the request), the Agency has no obligation to create or obtain metadata in this case because the Agency does not possess the records in native format. *See LaRoche v. SEC*, 289 F. App'x 231, 231 (9th Cir. 2008) (explaining that agency was not required to create new documents to satisfy FOIA request when it could not readily reproduce records sought in searchable electronic format requested). Nor would such an interpretation of the phrase "in PDF format" make sense in the specific circumstances of the Agency's records because the Agency's FOIA processing software removes all metadata (even in circumstances where the Agency possesses that metadata) when a document is converted to PDF so that the Agency can apply redactions. In other words, even if the Agency had the underlying native versions of the Dr. Morens' emails, it would not have released those records to Plaintiff with metadata. Garcia-Malene Decl. ¶ 28.

Third, under the FOIA, the Agency has no obligation to pursue records that may exist and be in possession of a former employee. *See, e.g., Jackson v. U.S. Dep't of Labor*, No. 06-cv-02157, 2008 WL 539925, at *5 n.2 (E.D. Cal. Feb. 25, 2008) (magistrate's recommendation) (finding that agency "is not required to pursue any records that may exist and be in possession of a retired employee"), *adopted*, No. 06-cv-2157, 2008 WL 4463897 (E.D. Cal. Oct. 2, 2008); *Antonelli v. U.S. Parole Comm'n*, 619 F. Supp. 2d 1, 4 (D.D.C. 2009) ("an agency component is obligated to produce only those records in its custody and control at the time of the FOIA request"). Moreover, the Agency lacks authority to demand that Dr. Morens—who is now a private citizen—comply with a request to reproduce native versions of emails in his personal Gmail account. Garcia-Malene Decl. ¶ 29.

Fourth, from a practical perspective, any dispute regarding the native versions of the emails in Dr. Morens' personal email account is now moot because Plaintiff refuses to narrow the scope of its FOIA request. Indeed, as Plaintiff's counsel has indicated: "let us remember that the reason we are discussing metadata in the first place is an effort to narrow Request Two and allow the agencies to produce records

in a faster fashion." But if Plaintiff is not willing to narrow the scope of this FOIA request (and thereby shorten the time required to process the records that Plaintiff wants in this case), there is no benefit to be gained from an attempt to obtain native versions of the emails from Dr. Morens.[2]

DATED: May 13, 2025

Respectfully submitted,

PATRICK D. ROBBINS
Acting United States Attorney

*/s/ Jevechius D. Bernardoni\**
JEVECHIUS D. BERNARDONI
Assistant United States Attorney

Attorneys for Federal Defendant

DATED: May 13, 2025

*/s/ Daniel C. Snyder*
DANIEL C. SNYDER
PUBLIC JUSTICE

DATED: May 13, 2025

*/s/ Richard Brody*
RICHARD BRODY
Greenfire Law, PC

Attorneys for Plaintiff
US RIGHT TO KNOW

\**In compliance with Civil Local Rule 5-1(i)(3), the filer of this document attests under penalty of perjury that all signatories have concurred in the filing of this document.*

---

[2] Notwithstanding that (1) the Agency intends to release records in the precise format requested by Plaintiff's FOIA request, (2) the Agency does not have possession of the records with metadata, and the belated request for metadata for these records is thus not readily reproducible, (3) the Agency has no obligation under the FOIA to seek and create new records (as Plaintiff's demand for the Agency to seek native versions of these documents would require), and (4) this entire dispute, as a practical matter, is moot as a result of Plaintiff's refusal to narrow the scope of its FOIA request, the Agency followed up with the Department of Health and Human Services to determine whether native versions of these documents could be obtained by other means. The Agency reports that neither it nor the Department of Health and Human Services has a legal basis upon which to demand that Dr. Morens reproduce this document set in native format, nor would a request for voluntary compliance be successful. *See* Garcia-Malene Decl. ¶ 29.